1  Sharon Medellín, Esq. (SBN 213798)
   Alvarez-Glasman & Colvin
2  Attorneys at Law
   13181 Crossroads Parkway North
3  Suite 400 – West Tower
   City of Industry, CA  91746
4  Tel.: (562) 699-5500 Fax:  (562) 692-2244
   rcolvin@agclawfirm.com smedellin@agclawfirm.com
5

6  Attorneys for Defendants City of
   Huntington Park and Cosme Lozano
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  CHRISTOPHER LISNER, an individual,     Case No.: 5:19-cv-02009 VAP (SPx)
                                         )
12                                       ) (*Assigned to the Honorable Virginia A. Phillips*)
                                         )
13             Plaintiff,                ) DEFENDANT CITY OF HUNTINGTON
                                         ) PARK'S NOTICE OF MOTION AND
14       v.                              ) MOTION FOR SUMMARY JUDGMENT;
                                         ) MEMORANDUM OF POINTS AND
15                                       ) AUTHORITIES
                                         )
16  CITY OF HUNTINGTON PARK, a           )
    municipality incorporated by the State of )
17  California; COSME LOZANO; DOES       )
    1through 10, inclusive,              ) DATE:  October 5, 2020
18                                       ) TIME:   2:00 P.M.
                                         ) CTRM:  8A, 8th Floor
19             Defendants.               )
                                         )
20                                       ) Action Filed: October 16, 2019
                                         ) Trial Date: January 19, 2021
21  _____ )

22       TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

23       PLEASE TAKE NOTICE that on October 5, 2020 at 2:00 p.m. or as soon thereafter as

24  counsel may be heard, in Courtroom 8A of the above-captioned Court, located at 350 West 1st

25  Street, Los Angeles, CA 90012, Defendants City of Huntington Park and Cosme Lozano

26  (collectively, the "City") will and hereby do move the Court for an order granting summary

27  judgment on the Complaint filed herein by Plaintiff Christopher Lisner.

28  ///

                                         1

1   This Motion is made pursuant to Federal Rules of Civil Procedure, Rule 56, on the

2   grounds that Plaintiff's claim for retaliation pursuant to 42 U.S.C., Section 1983 fails as a matter

3   of law because the alleged constitutionally-protected activities were not a substantial or

4   motivating factor in his termination, and the City would have terminated Plaintiff's employment

5   absent the activities.

6   This Motion is based upon this Notice of Motion, the attached Memorandum of Points

7   and Authorities, the concurrently-filed Declaration of Sharon Medellín, the concurrently-filed

8   Statement of Undisputed Facts, the files and records in this action, and any further evidence and

9   argument that the Court may receive at or before the hearing.

10

11   Dated:  September 2, 2020                    ALVAREZ-GLASMAN & COLVIN
                                                   ARNOLD M. ALVAREZ-GLASMAN
12                                                 CITY ATTORNEY

13

14                                                 /s/ Sharon Medellín
                                                   Sharon Medellín
15                                                 Attorneys for Defendants
                                                   City of Huntington Park and Cosme Lozano
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 5

II.   BACKGROUND FACTS ..................................................................................... 6

III.  THE UNDISPUTED MATERIAL FACTS.......................................................... 8

IV.   THE LEGAL STANDARD................................................................................ 12

V.    PLAINTIFF'S SOLE CLAIM FOR RETALIATION UNDER 42 U.S.C., SECTION
      1983 IS BARRED............................................................................................. 13

    A.   THE SOLE CLAIM FOR RETALIATION FAILS AS A MATTER OF LAW BECAUSE
      PLAINTIFF'S TERMINATION WAS ENTIRELY UNRELATED TO THE ALLEGED
      PROTECTED ACTIVITIES   AND PLAINTIFF'S EMPLOYMENT WOULD HAVE BEEN
      TERMINATED ABSENT THE ACTIVITIES ...............................................................14

    1.   Plaintiff's Statements Regarding the 5150 Hold Do Not Amount To Protected Speech......15

        a.   Plaintiff Was Not Speaking On A Matter Of Public Concern ............................15
        b.   Plaintiff Was Not Speaking As A Private Citizen ................................................16

    2.   The Alleged Protected Activity Was Not a Substantial or Motivating Factor in the
      Termination ................................................................................................................17

    3.   The City Would Have Terminated Plaintiff's Employment Even Absent The Allegedly
      Protected Activities.....................................................................................................21

VI.   CONCLUSION................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................13

*Carmen v. S.F. Unified Sch. Dist.*,
   237 F.3d 1026 (9th Cir. 2001) .........................................................................13

*Connick v. Myers*,
   461 U.S. 138 (1983)..........................................................................................16

*Falls Riverway Realty, Inc. v. Niagara Falls*,
   754 F.2d 49 (2d Cir. 1985) .........................................................................13, 18

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006)............................................................................14, 15, 16

*Gibson v. Office of Attorney Gen.*,
   561 F.3d 920 (9th Cir. 2009) ...........................................................................14

*IDK, Inc. v. County of Clark*,
   836 F.2d 1185 (9th Cir. 1988) .........................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..........................................................................................13

*Pickering v. Board of Education*,
   391 U.S. 563 (1968)..........................................................................................19

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984)..........................................................................................14

*Scott v. Harris*,
   550 U.S. 372 (2007)..........................................................................................13

*Thornhill Pub. Co., Inc. v. GTE Corp.*,
   594 F.2d 730 (9th Cir. 1979) .....................................................................13, 18

**Statutes**

42 U.S.C., Section 1983 ........................................................................................13

Federal Rule of Civil Procedure 56(e) ..................................................................13

Federal Rules of Civil Procedure 56(a) .................................................................12

Welfare and Institutions Code - WIC Section 5150.05 .....................................9, 15

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff Christopher Lisner's employment as a Police Officer with the Huntington Park Police Department (the "Department") was terminated effective January 8, 2018, after an independent investigation and two *Skelly* conferences revealed and confirmed eight separate violations of Huntington Park Police Department policies by Plaintiff.  The investigation was initially prompted by complaints of possible discrimination and/or harassment lodged by a female Sergeant and a female mental health clinician employed by an outside agency.  While Plaintiff's conduct was ultimately determined not to rise to the level of discrimination, Plaintiff nevertheless was found to have engaged in conduct that amounted to disobedience and insubordination, to have disrupted the efficiency of the Department, and to have failed to obtain proper authorization before releasing confidential Department documents.  Consequently, the Department issued a Notice of Proposed Disciplinary Action informing Plaintiff that he would be demoted from the rank of Sergeant to Senior Police Officer.  At the ensuing *Skelly* conference, Plaintiff disclosed for the first time that he had information that he believed established that members of the Department had committed misconduct and/or criminal violations.  Plaintiff did not provide the details of that information when he learned it or at the *Skelly* conference, despite the fact that four separate Department policies require officers to report misconduct or policy violations by other members of the Department. Rather, Plaintiff held onto that information to use as leverage in his disciplinary proceedings.  Due to the seriousness of those additional policy violations by a member of the Department in supervisory capacity such as Plaintiff, the proposed level of discipline was modified from demotion to termination.

On October 16, 2019, Plaintiff initiated this lawsuit alleging a single cause of action for retaliation for engaging in what he deems freedom of speech and freedom of association activities.[1]  Those activities, however, are entirely unrelated to the Policy violations revealed by

---

[1] On May 17, 2018, Plaintiff initiated a state court action for wrongful termination/retaliation solely against the City of Huntington Park arising out of essentially the same alleged events. That action was dismissed on summary judgment. The parties stipulated to using the state court discovery in these federal proceedings.

the Internal Affairs Investigation or the *Skelly* conference.   Critically, the initial level of discipline proposed by the Department after all the alleged protected activities occurred was merely *demotion*.   As such, they provide absolutely no grounds for a retaliation claim against the City for the decision to *terminate* his employment, which was the result of his withholding information in violation of Department policies and, therefore, unquestionably does not amount to protected speech.   Plaintiff's claims of retaliation are nothing more than a transparent afterthought based on a creative interpretation of the facts as an attempt to distract from his own conduct.

The City brings the present Motion on the grounds that the claim for retaliation for allegedly engaging in constitutionally-protected activities fails as a matter of law because the decision to terminate his employment was entirely unrelated to the alleged activities and because the termination would have occurred absent the alleged activities.   Therefore, the City is entitled to summary judgment on the entirety of Plaintiff's Complaint.

## II.   BACKGROUND FACTS

On February 1, 2015, the County of Los Angeles Department of Mental Health and the City of Huntington Park, among other local governmental agencies, entered into a Memorandum of Agreement ("MOA) for the purpose of forming mental health evaluation units referred to as the Southeast Region Mental Evaluation Teams ("SRMET").   (Medellín Dec., Ex. A.)  Pursuant to the MOA, the City committed to provide resources in order to staff the program and address mental health issues involving members of the public. (Id., at p. 1.)   The City provided one sworn officer that would be paired with a mental health clinician from the County. (Medellín Dec., Ex. B, p. 11.)   County Mental Health Clinician Samantha Lopez was assigned to work with the City pursuant to the MOA, and Officer Mario Bojorquez, who was part of Plaintiff's work shift at the time, was the City's officer designee for purposes of the program. (Id.)   Sgt. Abigail Valle supervised Huntington Park's SRMET efforts. (Id.)   Lt. Neil Castelli was Plaintiff's immediate supervisor during the relevant timeframe. (Medellín Dec., Ex. C, p. 67:4-7.)

On August 3, 2016, Sgt. Valle contacted Lt. Castelli via telephone and informed him

that she and Plaintiff had a conversation during which he expressed anger over a way she handled a call and stated to her that he does "real police work, not that touchy feely stuff you do." (Medellín Dec., Ex. D, p. 1.) She also told Lt. Castelli that Plaintiff constantly makes belittling statements to her about her police work, decision making, and the programs she is involved in (SRMET and the Pink Patch Project for breast cancer awareness). (Id.)

On August 4, 2016, Lt. Castelli was again contacted by Sgt. Valle to complain that Plaintiff was making derogatory comments to her and creating an uncomfortable working environment. (Id.) She also stated that Plaintiff has been going to subordinate officers and asking them if the decisions she made in the field were appropriate. (Id; Medellín Dec., Ex. F, p.7.) She felt these actions were undermining her authority, standing, and credibility as a supervisor. (Id.) Lt. Castelli separately noted that Sgt. Valle had expressed to him over the past few months that working with Plaintiff is "exhausting" and that she has difficulty completing her job duties during the two hours that her shift overlaps with that of Plaintiff because of his constant anger over various issues. (Id., at pp. 1-2.)

Also, in this same timeframe, Clinician Lopez went to her immediate supervisor within the Department of Mental Health, Isabella Vidriales, to complain that she felt Plaintiff was inappropriately questioning her integrity and that, consequently, she felt uncomfortable while working in Huntington Park. (Medellín Dec., Ex. E, pp. 5-9.) Ms. Vidriales contacted Sgt. Valle on August 5, 2016, to report the conversation and separately advised Sgt. Valle that she had had multiple similar conversations with Clinician Lopez regarding Plaintiff on previous occasions. (Id.)

On August 5, 2016, Sgt. Valle contacted Lt. Castelli at home on his day off to report that Clinician Lopez contacted her by telephone to state that she no longer feels comfortable working with the Department due to being verbally badgered by Plaintiff. (Medellín Dec., Ex. D, p. 2; Ex. F., p. 1.) Clinician Lopez further stated that Officer Bojorquez was receiving comments from Plaintiff and officers under his supervision such as, "Are you here to do real police work today?" and "Are you working the 'hugs not handcuffs' program today?" (Id; Medellín Dec., Ex. F. p. 2.) When Sgt. Valle informed Officer Bojorquez that she needed to

1  speak with him about these recent events, he indicated that he would not speak to her while

2  Plaintiff was working.  (Medellín Dec., Ex. F, p. 7.)

3      RCS Investigations and Consulting, through investigator Steve Rodig, was retained by

4  the Department to conduct an independent administrative investigation regarding allegations of

5  possible work-related misconduct by Plaintiff (the "Investigation") stemming from the

6  aforementioned events.  (Medellín Dec., Ex. B, p. 2.)  On August 17, 2016, Plaintiff was placed

7  on paid administrative leave with pay while the Investigation was pending.  (Medellín Dec., Ex.

8  G, p. 1.)  Plaintiff was advised that he should contact Lt. Alfred Martinez or his designee if he

9  had any questions regarding his administrative leave. (Id., at p. 2.)

10  **III.    THE UNDISPUTED MATERIAL FACTS**

11      Lt. Castelli recommended that the Department initiate an administrative investigation of

12  Plaintiff based on the complaints of possible discrimination/harassment lodged by Sgt. Valle

13  and Clinician Lopez, as well as additional information that he learned indicating that Plaintiff

14  had used Department e-mail to send unsolicited confidential police reports without approval to

15  Clinician Lopez and that Lisner used his personal cell phone to send inappropriate text

16  messages to Clinician Lopez's personal cell phone.  (Statement of Undisputed Facts ["SUF"], ¶

17  1.)  Lt. Castelli determined that Plaintiff's actions, if proven true, could amount to violation(s)

18  of Department policy.  (SUF, ¶ 2.)

19      Plaintiff's interview as part of the Investigation occurred on December 5, 2016.  (SUF, ¶

20  3.)  Plaintiff admitted to Mr. Rodig during his interview that he uses the term "hugs versus

21  handcuffs" when discussing what he refers to as the "touchy-feely programs more so than the

22  arrest them programs, it's meant as a joke."  (SUF, ¶ 4.)  He further admitted that he has had

23  conversations with Sgt. Valle regarding his "hugs versus handcuffs" view on police work.

24  (SUF, ¶ 5.)  He also admitted that it was possible he made such comments to Sgt. Valle (SUF, ¶

25  6) and that he "probably" made such comments in a briefing environment (i.e., in front of other

26  officers) (SUF, ¶ 7.)

27      Consistent with his statements during the interview, Plaintiff told Clinician Lopez out of

28  frustration over the handling of a particular call on August 3, 2016, involving a 5150 suspect

that she "can go 5150 the world, it's up to you." (SUF, ¶ 8.) Plaintiff likewise referred to Clinician Lopez as a "tree hugger" (SUF, ¶ 9) and indicated that she was "saving the officers from doing real police work." (SUF, ¶ 10).

With respect to the subject 5150 call, Plaintiff went on to characterize his discussions with Sgt. Valle, the supervising Sergeant on the call, regarding the "legalities" surrounding the incident as a mere difference of opinion. (SUF, ¶ 11.) In that regard, Plaintiff stated, "Me, personally, I feel that an arrest *would've been better than a 5150 hold*. … We had a discussion about that. It wasn't accusatory; it was more of a discussion. It was more *my opinion* and I even qualified it at the end with *it's your decision* to make, but that's how I would've done it. Again, I'm *biased because, or perhaps I'm biased, because I worked gangs and I worked AB109*. … It wasn't an argument, it wasn't a heated discussion, *it was differing opinions in my description of it*. It seemed like *a regular conversation about a discussion over legalities* and decision making. … I would call it *a discussion between people of equal rank*. … I said my opinion was, like I said *we had a different opinion* on the two things. My opinion was he should've been arrested and again, I clarified it as her decision to make. I would've made a different one, and again perhaps I'm biased, because I worked gangs and AB109." (SUF, ¶ 12, emphasis added.) Indeed, Plaintiff went on to admit that there is "nothing wrong" with two people having a different perception of events. (SUF, ¶ 13.) He likewise informed Mental Health Supervisor Vidriales that he would never write a 5150 hold based on collateral information even though Section 5150.05 specifically allows it. (SUF, ¶ 14.) Plaintiff did not volunteer his statements regarding the now-alleged unlawful detention at the outset of his interview; he only mentioned it in response to a specific question *asked by Mr. Rodig* surrounding Sgt. Valle's complaints about the manner in which she was questioned regarding the call. (SUF, ¶ 15.)

Officer Bojorquez and Clinician Lopez each prepared a report concerning the subject 5150 detention, including the facts supporting the detention, to the Department in the August 3-5, 2016 timeframe. (SUF, ¶ 16.) Sgt. Valle, Officer Bojorquez, and Clinician Lopez all agreed that the subject 5150 hold was legal and proper under the circumstances. (SUF, ¶ 17.) Plaintiff

did not report the issue to Lt. Castelli even though he admitted he could have easily done so that night via phone call or email.  (SUF, ¶ 18.)  Plaintiff sent emails and text messages to Clinician Lopez that evening regarding the call.  (SUF, ¶ 19.)  He did not include Sgt. Valle or Lt. Castelli on the messages because he "didn't see a need to."  (SUF, ¶ 20.) Plaintiff's decision to "help with the call" stemmed from knowledge he gained from working the Gang Unit (SUF, ¶ 21), the fact that Officer Bojorquez was present during the call (SUF, ¶ 22), and the fact that calls the SRMET team went on, actions they took, and reports they generated would "go through" him (SUF, ¶ 23.)  Plaintiff admittedly reviewed Officer Bojorquez's report regarding the call as part of his duties as a Sergeant. (SUF, ¶ 24.)

At the conclusion of the Investigation, Mr. Rodig sustained the allegations of the investigation that: (1) Plaintiff engaged in conduct that disrupted the efficiency of the Department relating to the SRMET program; and (2) Plaintiff failed to obtain proper authorization before releasing confidential Department documents to Clinician Lopez.  (SUF, ¶ 25.)  Those allegations amounted to violations of four different Department policies.  (SUF, ¶ 26.)

Based on Mr. Rodig's findings from the Investigation, a Notice of Proposed Disciplinary Action ("Notice) was issued to Plaintiff on June 29, 2017.  (SUF, ¶ 27.)  The Notice informed Plaintiff that he was facing a demotion to the rank of Senior Police Officer arising out of the sustained findings, which amounted to four separate Department policy violations.  (SUF, ¶ 28.) Specifically, it was determined that Plaintiff engaged in: (1) disobedience and/or insubordination; (2) disparaging remarks or conduct disrupting the efficiency of the Department or subverting the good order, efficiency and discipline of the Department or which would tend to discredit any member of the Department; (3) on-duty conduct which an employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency, morale, or which tends to reflect unfavorably upon the Department or its members; and (4) the unauthorized, intentional release of designated confidential information, materials, data, forms or reports.  (SUF, ¶ 29.)   Chief Lozano arrived at the proposed level of discipline (i.e., demotion) after conferring with all Department Lieutenants (SUF, ¶ 30), and

1    each Lieutenant agreed that demotion was appropriate under the circumstances (SUF, ¶ 31).

2    On September 7, 2017, a *Skelly* conference was held concerning the proposed demotion.

3    (SUF, ¶ 32.)  A Notice of Proposed Modified Disciplinary Action was then issued on October

4    11, 2017, elevating the level of discipline to termination.  (SUF, ¶ 33.) The discipline was

5    modified when it was revealed during the *Skelly* conference that Plaintiff had information he

6    believed established that Chief Lozano and/or other Department employees coerced the

7    complaints made by Sgt. Valle and Clinician Lopez and engaged in other misconduct and/or

8    criminal conduct, the complete details of which Plaintiff declined to provide during the

9    conference.  (SUF, ¶ 34.)  Plaintiff's failure to disclose misconduct on the part of Department

10   personnel at the time he learned it amounted to four additional policy violations. (SUF, ¶ 35.)

11   Plaintiff's failure to disclose misconduct on the part of Department personnel at the time he

12   learned it formed the grounds for termination.  (SUF, ¶ 36.)  The proposed modification was

13   based on Plaintiff's: (1) failure to promptly and fully report activities on their own part or the

14   part of any other employee where such activities may result in criminal prosecution or

15   discipline; (2) omitting material information to a supervisor, or other person in a position of

16   authority, in connection with any investigation or in the reporting of any Department-related

17   business; (3) failure of a supervisor to take appropriate action to ensure that employees adhere

18   to the policies and procedures of the Department and the actions of all personnel comply with

19   all laws; and (4) failure to timely report known misconduct of an employee to his or her

20   immediate supervisor or to document such misconduct appropriately or as required by policy.

21   (SUF, ¶ 37.) Again, Chief Lozano arrived at the modified level of discipline (i.e., termination)

22   after conferring with all Department Lieutenants (SUF, ¶ 38), and each Lieutenant agreed that

23   termination was appropriate under the circumstances (SUF, ¶ 39).

24   On December 7, 2017, a second *Skelly* conference was held on the proposed termination.

25   (SUF, ¶ 40.)  At Plaintiff's request, then-Interim City Manager Ricardo Reyes served as the

26   hearing officer and Chief Lozano was removed from the process. (SUF, ¶ 41.) In connection

27   with the second *Skelly* conference, Mr. Reyes met with Chief Lozano in order to obtain

28   background information on the case.  (SUF, ¶ 42.)  During that meeting, Chief Lozano

1   impressed on Mr. Reyes that Plaintiff had generally been a "great officer" during his tenure with

2   the Department.  (SUF, ¶ 43.)  After the second *Skelly*, Mr. Reyes made the ultimate decision to

3   uphold the termination proposed by Chief Lozano in the October 11, 2017 Notice.  (SUF, ¶ 44.)

4   Mr. Reyes terminated Plaintiff's employment as of January 8, 2018.  (SUF, ¶ 45.)

5        Plaintiff was elected President of the POA while the Investigation was pending and he

6   was on administrative leave.  (SUF, ¶ 46.)  Even while on administrative leave, Plaintiff notified

7   Chief Lozano that he was challenging the appointment of the outside Lieutenant conducting his

8   internal affairs investigation.  (SUF, ¶ 47.)  Plaintiff specifically alleges that, as a result, Chief

9   Lozano replaced the subject Lieutenant with an acting Lieutenant from within the Department.

10   (SUF, ¶ 48.)   Additionally, Plaintiff was presented with a Medal of Valor while on paid

11   administrative leave while his IA was being conducted, arising out of an officer-involved

12   shooting that took place on April 15, 2016.  (SUF, ¶ 49.)  Nevertheless, Plaintiff alleges that

13   Chief Lozano retaliated against him because he sent an email to POA members discussing the

14   "unfortunate recent exodus" of sworn peace officers since Chief Lozano had been named Chief

15   of Police (SUF, ¶ 50), his discussion of a vote of "no confidence" against Chief Lozano during a

16   POA meeting (SUF, ¶ 51), his challenge to Chief Lozano's attempt to improperly limit officer's

17   use of "time off" (SUF, ¶ 52) [for which Chief Lozano issued a retraction and apologized to the

18   union membership (SUF, ¶ 53)], and questioning the legality of one particular 5150 hold (SUF,

19   ¶ 54). All of those events are alleged to have occurred in the June-August 2016 timeframe.

20   (SUF, ¶ 55.) The first of the events alleged to constitute constitutionally-protected activity took

21   place in June 2016. (SUF, ¶ 56.) The factual bases for the initial proposed demotion related to a

22   pattern of conduct going back to February 2016 (i.e., 4 months prior to the alleged protected

23   union activity). (SUF, ¶ 57.)  Plaintiff admits that Chief Lozano exhibited no bias against him at

24   any point during his career prior to being placed on administrative leave. (SUF, ¶ 58.)

25   **IV.   THE LEGAL STANDARD**

26        A motion for summary judgment must be granted when "… there is no genuine issue as

27   to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

28   R. Civ. P. 56(a). The "threshold inquiry" is whether "there is any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it well bear the burden of proof at trial. *Id.*  The burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence … will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc., supra,* at 252.

In deciding a summary judgment motion, the court must view the facts and draw *reasonable inferences* in the light most favorable to the non-moving party.  *Id.* at 255; *Scott v. Harris*, 550 U.S. 372, 378 (2007). A district court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotations omitted). Conclusory, speculative testimony in affidavits and motion papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## V.   PLAINTIFF'S SOLE CLAIM FOR RETALIATION UNDER 42 U.S.C., SECTION 1983 IS BARRED

By way of the Complaint, Plaintiff alleges a single cause of action under 42 U.S.C., Section 1983 for retaliation in violation of the free speech protection of the First Amendment and the freedom of association protection of the Fourteenth Amendment.  The Supreme Court has recognized two types of free association rights; the right to intimate relationships (i.e., those

that attend the creation and sustenance of a family and similar highly personal relationships) and the right to associate for the purpose of engaging the activities set forth in the First Amendment (i.e., speaking, worshipping, and petitioning the government). *Roberts v. United States Jaycees*, 468 U.S. 609, 617-19 (1984).; *IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1192 (9th Cir. 1988). The former is protected as a personal liberty under the Fourteenth Amendment, while the latter is protected by the First Amendment. (*IDK, Inc. v. County of Clark, supra,* at 1191-92. As such, Plaintiff's retaliation claim under the Fourteenth Amendment is identical to the retaliation claim under the First Amendment, although phrased in terms of union activity.

### A. THE SOLE CLAIM FOR RETALIATION FAILS AS A MATTER OF LAW BECAUSE PLAINTIFF'S TERMINATION WAS ENTIRELY UNRELATED TO THE ALLEGED PROTECTED ACTIVITIES AND PLAINTIFF'S EMPLOYMENT WOULD HAVE BEEN TERMINATED ABSENT THE ACTIVITIES

Plaintiff cannot state a claim for retaliation against the City because there no logical nexus between the allegedly protected activities at issue in this case and his termination. Under the First Amendment, a public employee has a qualified right to speak on matters of public concern. (*Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).) When considering a public employee's First Amendment retaliation claim, the court considers: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. *Gibson v. Office of Attorney Gen.*, 561 F.3d 920, 925 (9th Cir. 2009). In this lawsuit, Plaintiff alleges that Chief Lozano personally retaliated against him by initiating the Investigation because Plaintiff sent an email to POA members discussing the "unfortunate recent exodus" of sworn peace officers since Chief Lozano had been named Chief of Police, he discussed of a vote of "no confidence" against Chief Lozano during a POA meeting, he challenged Chief Lozano's attempt to improperly limit officer's use of "time off," and he questioned the legality of a specific 5150 hold that occurred on August 3, 2016. (SUF, ¶¶ 50-54) However, the undisputed

facts of this case establish that the aforementioned activities were not a substantial or a motivating factor in his termination and were, instead, entirely unrelated. Consequently, the City would have still terminated Plaintiff's employment even if they had not occurred.

    **1. Plaintiff's Statements Regarding the 5150 Hold Do Not Amount To Protected Speech**

        **a. Plaintiff Was Not Speaking On A Matter Of Public Concern**

As an initial matter, Plaintiff's alleged questioning of the legality of the subject 5150 hold did not pertain to a matter of public concern and, therefore, cannot provide a basis for the retaliation claim. Simply put, Plaintiff characterized the discussions he had with Sgt. Valle as a mere difference of opinion. (SUF, ¶ 11.) In that regard, Plaintiff stated, "Me, personally, I feel that an arrest *would've been better than a 5150 hold*. … We had a discussion about that. It wasn't accusatory; it was more of a discussion. It was more *my opinion* and I even qualified it at the end with *it's your decision* to make, but that's how I would've done it. Again, I'm *biased because, or perhaps I'm biased, because I worked gangs and I worked AB109*. … It wasn't an argument, it wasn't a heated discussion, *it was differing opinions in my description of it*. It seemed like *a regular conversation about a discussion over legalities* and decision making. … I would call it *a discussion between people of equal rank*. … I said my opinion was, like I said *we had a different opinion* on the two things. My opinion was he should've been arrested and again, I clarified it as her decision to make. I would've made a different one, and again perhaps I'm biased, because I worked gangs and AB109." (SUF, ¶ 12, emphasis added.) Plaintiff's self-proclaimed bias was exemplified by the fact that he informed Mental Health Supervisor Vidriales that he would never write a 5150 hold based on collateral information even though Section 5150.05 specifically allows it. (SUF, ¶ 14.) Indeed, Plaintiff went on to admit during his interview with Mr. Rodig that there is "nothing wrong" with two people having a different perception of the events. (SUF, ¶ 13.) Plaintiff's statements surrounding possible violations during that incident were so couched in qualifying language regarding differences of opinion and personal bias that they did not amount to protected activity to begin with. Underlying the relevant caselaw "has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee

grievance." *Garcetti v. Ceballos, supra,* at 420, quoting *Connick v. Myers,* 461 U.S. 138, 154 (1983).

Moreover, Officer Bojorquez and Clinician Lopez each prepared a report concerning the subject 5150 detention, including the facts supporting the detention, to the Department in the August 3-5, 2016 timeframe. (SUF, ¶ 16.) Sgt. Valle, Officer Bojorquez, and Clinician Lopez all agreed that the subject 5150 hold was legal and proper under the circumstances. (SUF, ¶ 17.) Plaintiff did not report the issue to Lt. Castelli even though he admitted he could have easily done so the night it occurred via phone call or email. (SUF, ¶ 18.) While Plaintiff sent emails and text messages to Clinician Lopez that evening regarding the call, he did not include Sgt. Valle or Lt. Castelli on the messages because he "didn't see a need to." (SUF, ¶¶ 19-20.) If Plaintiff was so concerned over the seriousness of a potential violation of the detainee's rights that night so as to now form a basis for a retaliation claim, it is more than curious that he did not "see a need" to include the Department's supervisor of the SRMET program or her supervisor on the messages questioning Clinician Lopez's actions.

Indeed, the self-described "disagreement" over the handling of the call had nothing to do with a concern over an illegal detention. Rather it was the result of Plaintiff's self-admitted bias having previously worked the Department's Gang Unit. (SUF, ¶ 12.) Plaintiff wanted to violate the suspects parole and arrest him (i.e., merely a *different form* of custody), which is entirely in line with his criticism of the "hugs versus handcuffs" approach to law enforcement, his statement to Sgt. Valle that he does "real police work, not the touchy feely stuff" the SRMET program does, and his reference to Clinician Lopez as being a "tree hugger." (SUF, ¶¶ 4-7, 9-10.) Plaintiff's personal preference regarding the manner in which the call should have been handled, when it admittedly was not handled illegally, does not rise to the level of constitutionally-protected speech.

### b. Plaintiff Was Not Speaking As A Private Citizen

Moreover, an employee's speech in the course of carrying out his or her official responsibilities is not protected speech, even if the speech is a matter of public concern. "[W]hen public employees make statements pursuant to their official duties, the employees are

not speaking as citizens for First Amendment purposes ….” *Garcetti v. Ceballos,* 547 U.S. 410, 421. Plaintiff's decision to “help with the call,” as he referred to his involvement, stemmed from knowledge he gained from working the Gang Unit, the fact that calls the SRMET team went on, actions they took, and reports they generated would “go through” him, and the fact that Officer Bojorquez was present during the call; Plaintiff admittedly reviewed Officer Bojorquez's report regarding the call as part of his duties as a Sergeant. (SUF, ¶¶ 21-24.) Moreover, Plaintiff did not volunteer his statements regarding the alleged unlawful detention at the outset of his interview with Mr. Rodig; he only mentioned it in response to specific questions *asked by Mr. Rodig* surrounding Sgt. Valle's complaints about the manner in which she was questioned regarding the call.  (SUF, ¶ 15.) Nor was Plaintiff reporting improper conduct in connection with the handling of the call.  As such, his internal discussions regarding the handling of the call were unquestionably part of his job duties and, therefore, do not amount to protected speech for First Amendment purposes.

### 2. The Alleged Protected Activity Was Not a Substantial or Motivating Factor in the Termination

The undisputed facts of this case likewise establish that Plaintiff's termination did not amount to retaliation on the part of Chief Lozano and was entirely unrelated to the alleged constitutionally-protected activities.  Critically, the idea of an administrative investigation into the complaints made by Clinician Lopez and Sgt. Valle against Plaintiff did not emanate from Chief Lozano to begin with.  It was *Lt. Castelli* who requested that an investigation be undertaken concerning Plaintiff's conduct related to SERMET based on *his* preliminary findings that the conduct complained of, if proven true, could amount to violation(s) of Department policy.  (SUF, ¶¶ 1-2.)  In other words, Lt. Castelli had already made that determination for himself and there is absolutely no evidence in this case that Chief Lozano influenced Lt. Castelli's recommendation ahead of time.  Additionally, Plaintiff admits that Chief Lozano awarded him with a Medal of Valor after the alleged protected speech activity took place and he was placed on paid administrative leave. (SUF, ¶ 49.)  That is hardly the act of an individual holding personal animus and determined to retaliate, as Plaintiff contends.  It is

likewise undisputed that Chief Lozano sought the input of all the Lieutenants employed by the Department in advance of any discipline being proposed.  (SUF, ¶¶ 30-31, 38-39.) He arrived at *both* the initial proposed level of discipline of demotion and the subsequent modified discipline of termination after conferring with all the Lieutenants and after each Lieutenant agreed that demotion and ultimately termination were appropriate under the circumstances.   (Id.) Furthermore, it was Mr. Reyes's ultimate decision whether to uphold or modify the proposed termination of Plaintiff's employment, and Mr. Reyes decided that it should be upheld.  (SUF, ¶¶ 44-45.)  Nowhere does the Complaint allege that Mr. Reyes retaliated against Plaintiff or that he was acting at the behest of Chief Lozano in rendering his decision.  Lastly, it is undisputed that Chief Lozano stressed to Mr. Reyes that Plaintiff had generally been a "great officer" during his time with the Department prior to Mr. Reyes making his final decision on the matter, a fact that is again contrary to Plaintiff's allegation that Chief Lozano held some sort of personal animus against him and set in motion a calculated plan to retaliate. (SUF, ¶ 43.)  Plaintiff's allegations of retaliation are based on nothing but conjecture and surmise, which is inadmissible to defeat summary judgment.  *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).

Moreover, neither the timeline of events nor the level of discipline ultimately imposed by the City supports Plaintiff's nefarious version of the events.  Plaintiff's interview by Mr. Rodig as part of the Investigation occurred on December 5, 2016.  (SUF, ¶ 3.)  A Notice of Proposed Disciplinary Action was issued to Plaintiff approximately 6 months later on June 29, 2017.  (SUF, ¶ 27.)  At that time, Plaintiff was facing a demotion to the rank of Senior Police Officer arising out of sustained findings of four separate Department policy violations, none of which related to comments made to members of the Department at POA meetings or in written correspondence about Chief Lozano prior to that date.  (SS, ¶ 28.)  Stated differently, each of the alleged instances of protected speech occurred *before* Chief Lozano issued the Proposed Notice of Disciplinary Action merely demoting him to the rank of Senior Police Officer, directly negating Plaintiff's assertion that he was *terminated* as a result of constitutionally-protected activities.  A Notice of Proposed Modified Disciplinary Action was then issued on

October 11, 2017, elevating the level of discipline to termination arising due to *four additional policy violations*. (SS, ¶¶ 33-35.)   Again, none of those policy violations had anything whatsoever to do with the Plaintiff's alleged acts of protected speech.   Instead, those additional policy violations arose out of Plaintiff's failure to report acts of misconduct and/or criminal conduct by members of the Department, as required by Department policy.   Plaintiff's employment was then terminated effective January 8, 2018.  (SS, ¶ 45.)  Thus, the undisputed material facts unequivocally establish that the subject adverse employment action (termination) was not even contemplated at the time the Notice of Proposed Disciplinary Action was issued in June 2017.   Four entirely separate policy violations supported the then-proposed demotion. Termination of employment was only contemplated *after* it was revealed that Plaintiff committed further Department policy violations. As such, it is not reasonably inferred that the alleged protected speech was a substantial or motivating factor in his termination.   Importantly, Plaintiff's failure to report misconduct by members of the Department simply does not amount to protected speech to begin with as it is not speech at all, and, therefore, cannot provide a legal basis for a retaliation claim under the First Amendment.

Additionally, the Notices of Proposed and Modified Disciplinary action provide ample justification for Plaintiff's initial demotion and ultimate termination independent and irrespective of the alleged protected activities.  (SUF, ¶¶ 25-29, 33-37.)  The Investigation led to the discovery of multiple acts of misconduct, including insubordination, conduct disrupting the efficiency of the Department, conduct unbecoming of a member of the Department, and unauthorized release of confidential reports, all of which prompted the initial proposed discipline of demotion.  (SUF, ¶¶ 27-29.)  Particularly relevant here is the well-recognized rule that in the First Amendment context, the government has interest in promoting workplace efficiency and avoiding workplace disruption. *Pickering v. Board of Education*, 391 U.S. 563 (1968).  Additional policy violations relating to Plaintiff's failure to report alleged misconduct by members of the Department then caused the City, through the then-Interim City Manager, to affirm termination.  (SUF, ¶¶ 35-37, 44-45.)  Those additional discoveries caused real concern over Plaintiff's performance as a police officer for the City.  A police officer, especially one in a

supervisory role of Sergeant, is expected to act in a manner that is becoming of a person in that position and authority, and the City had valid reasons for Plaintiff's termination. Thus, the undisputed evidence in this case establishes that the decision to terminate Plaintiff's employment was made for legitimate, independent reasons (i.e., the additional policy violations after initially proposing a mere demotion) entirely unrelated to the alleged protected activity that occurred prior to Plaintiff even being placed on paid administrative leave in August 2016. Plaintiff's allegations of constitutionally-protected activity do not excuse his unrelated Department policy violations.

Moreover, the City did not engage in any conduct that interfered with the alleged constitutionally-protected activities to begin with.  By Plaintiff's own admission, he was elected President of the POA while the Investigation was pending and he was on administrative leave. (SUF, ¶ 46.)  Plaintiff does not allege that Chief Lozano or anyone at the City did anything to interfere with or prevent his election to the position.  Even while on administrative leave and after being elected, Plaintiff notified Chief Lozano that he was challenging the appointment of the outside Lieutenant conducting his internal affairs investigation.  (SUF, ¶ 47.)    Plaintiff specifically alleges that, as a result, Chief Lozano replaced the subject Lieutenant with an acting Lieutenant from within the Department.  (SUF, ¶ 48.) In other words, Chief Lozano complied with Plaintiff's request.   Additionally, Plaintiff was presented with a Medal of Valor on November 30, 2016, while on paid administrative leave while the Investigation was being conducted arising out of an officer-involved shooting that took place on April 15, 2016, which would have only strengthened his reputation in the eyes of the union members.  (SUF, ¶ 49.) That fact in and of itself negates Plaintiff's allegation of personal animus that Chief Lozano purported held against him.  The Complaint likewise alleges that Chief Lozano attempted to improperly limit the use of time off by Department employees.  (SUF, ¶ 52.)  In that regard, Plaintiff specifically alleges that Chief Lozano issued a retraction and apologized to the union membership.  (SUF, ¶ 53.)  The foregoing undisputed facts unequivocally establish that the City did not hesitate to consider Plaintiff's points and took action in support of his views when warranted during the course of his alleged union activities.  Although the Complaint alleges that

1    Plaintiff's termination was the result of an alleged bias against him by Chief Lozano, Plaintiff

2    admitted during his deposition that Chief Lozano exhibited no bias against him at any point

3    during his career with the Department, despite his active union involvement, prior to the

4    disciplinary action at issue in this case.  (SUF, ¶ 58.)  Again, the investigation of Plaintiff was

5    initiated *at the behest of Lt. Castelli*, not Chief Lozano.  (SS, ¶ 1.)

6         Lastly, the initial proposed demotion related to a pattern of conduct going back to

7    February 2016 (i.e., 5 months prior to the alleged protected union activity) and was justified by

8    legitimate business reasons. The Investigation and Proposed Notices of Disciplinary Action and

9    Modified Disciplinary Action all provide ample support for the determination that Plaintiff

10    committed multiple Department policy violations prior to his termination. The first of the events

11    alleged in the FAC to constitute protected union activity did not take place until June 2016.

12    (SUF, ¶ 56.) Stated differently, Plaintiff began the pattern of actions that ultimately were

13    determined to constitute grounds for demotion well in advance of the allegedly protected

14    activities, and the City did not make Plaintiff's conduct up out of whole cloth. The investigation

15    was requested by Lt. Castelli after Clinician Lopez complained to her own supervisor at the

16    Department of Mental Health and Sgt. Valle separately complained to Lt. Castelli.

17
18    **3.  The City Would Have Terminated Plaintiff's Employment Even Absent The Allegedly Protected Activities**

19         The undisputed facts of this case likewise establish that the City would have terminated

20    Plaintiff's employment irrespective of the alleged protective activity; the fact that demotion to

21    the rank of Senior Police Officer was proposed after all the alleged activity took place is

22    dispositive of the issue. As explained in full detail above, it was only after additional policy

23    violations were revealed at the second *Skelly* conference that the discipline was elevated to

24    termination. (SUF, ¶¶ 34-35.)  Those additional policy violations formed the grounds for

25    termination, and Plaintiff's employment would have been terminated even without the policy

26    violations revealed by Mr. Rodig's Investigation. (SUF, ¶ 36.) The failure to disclose

27    misconduct and/or criminal conduct, standing alone, in connection with the second *Skelly*

28    conference was the terminating offense. (Id.)  With respect to the present Motion, Plaintiff is

only entitled to *reasonable* inferences to be drawn from the undisputed facts, and it cannot be reasonably inferred that the alleged protective activity caused the City to terminate his employment given the undisputed sequence of events.

## VI.    CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court grant its Motion for Summary Judgment.


Dated:  September 2, 2020                    ALVAREZ-GLASMAN & COLVIN
                                            ARNOLD M. ALVAREZ-GLASMAN
                                            CITY ATTORNEY


                                            /s/ Sharon Medellín
                                            Sharon Medellín
                                            Attorneys for Defendants
                                            City of Huntington Park and Cosme Lozano

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the Central District of California – by using the CM/ECF system on September 2, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Executed on September 2, 2020, at City of Industry, California.

<u>/s/ Liza Slaughter</u>

4820-2759-4695, v. 1